UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN COOK, | ) | Case No.: 1:22 CV 1535 |
| | ) | |
| Plaintiff | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID BOSS, *et al.*, | ) | |
| | ) | |
| Defendants | ) | <u>ORDER</u> |

Currently pending before the court in the above-captioned case is Defendants City of Lyndhurst, David Boss, Kelly Vasas, Jonathon Romanin, and Justin Blatnick's (collectively, the "Lyndhurst Defendants" or "Defendants") Motion for Summary Judgment ("Motion") (ECF No. 43). For the reasons that follow, the court grants Defendants' Motion with respect to the federal claims. Because the court declines to exercise supplemental jurisdiction over Cook's state law claims pursuant to 28 U.S.C. § 1367(c)(3), Defendants' motion with respect to his state law claims is denied as moot.

**I. BACKGROUND**

**A.     Factual Background**

On April 2, 2020, Plaintiff John Cook ("Plaintiff" or "Cook") contacted the Cleveland Police Department to report that the truck registered to his business, Jaden Construction, LLC, had been stolen. (Amended Compl. ¶¶ 9–10, ECF No. 1-2); (*see also* Mot. at PageID #1624, ECF No. 43). A few days later, Cook recovered his vehicle without the assistance of law enforcement. (*See* Amended Compl. ¶ 12, ECF No. 1-2); (*see also* Mot. at PageID #1624, ECF No. 43). Cleveland Police

Department policy required officers to authenticate the vehicle and identity of the owner before removing the vehicle from the department's stolen vehicle registry. (*See* Mot. at PageID #1624, ECF No. 43) (citing Bellanca Decl., ECF No. 39-2). Because Cleveland never obtained proof of ownership, Cook's truck remained listed as stolen and unrecovered. (*See* Mot. at PageID #1625, ECF No. 43) (citing Bellanca Decl., ECF No. 39-2).

On July 30, 2020, Cook was driving his truck in the City of Lyndhurst, Ohio as police officers from the City of Lyndhurst ("Lyndhurst") were driving behind him. (Amended Compl. ¶ 13, ECF No. 1-2). One of the officers, Patrolman David Boss ("Officer Boss" or "Boss") performed a random check of Plaintiff's license plate and discovered that the vehicle was registered as stolen. (Mot. at PageID #1625, ECF No. 43) (citing Boss Deposition at PageID #1035, ECF No. 40-4). Officer Boss then requested back-up to perform a felony traffic stop on Plaintiff's vehicle. (Mot. at PageID #1625, ECF No. 43) (citing Cook Deposition at PageID #1041, ECF No. 40-4).

When Officer Jonathon Romanin ("Officer Romanin" or "Romanin") arrived on the scene, Boss ordered Plaintiff to exit the car with his back toward the officers at gunpoint. (Mot. at PageID #1626, ECF No. 43); (*see also* Romanin Deposition at PageID #979, ECF No. 40-3). The officers then ordered Cook to walk backwards toward them, instructing Cook to keep his hands above his head. (Romanin Deposition at PageID #979, ECF No. 40-3); (*see also* Amended Compl. ¶¶ 18–19, ECF No. 1-2). At this point, Officer Kelly Vasas ("Officer Vasas" or "Vasas") had also arrived to the scene. (Mot. at PageID #1626, ECF No. 43); (*see also* Romanin Deposition at PageID #980–81, ECF No. 40-3). Romanin proceeded to place Cook on his knees with his hands above his head before attempting to handcuff him. (Romanin Deposition at PageID #979, ECF No. 40-3). However, when Romanin attemped to handcuff Cook, Romanin noticed that he "could not move [Cook's] arm far enough back to place it in the handcuff." (*Id.* at PageID #982–83, ECF No. 40-3) Cook advised

Romanin that his left shoulder didn't have much mobility, which prompted Romanin to place a second pair of handcuffs on him "to lessen the strain on his shoulder so his arms wouldn't be pulled so far behind his back." (*Id.* at PageID #983, ECF No. 40-3).

Once Plaintiff was handcuffed, the officers withdrew their guns and Officer Romanin guided Cook to the patrol cars as a fourth officer, Officer Justin Blatnick ("Officer Blatnick" or "Blatnick"), arrived on the scene. (Mot. at PageID #1626, ECF No. 43) (citing Blatnick Deposition at PageID #1114, ECF No. 41-1). Shortly after Cook was handcuffed, Plaintiff complained to officers that he was losing circulation in his hand. (Mot. at PageID #1627, ECF No. 43) (citing Cook Deposition at PageID #1391–41, ECF No. 42-1); (*see also* Officer Romanin Body Camera Footage, Ex. A to ECF No. 45). Approximately one minute later, Officer Romanin adjusted Cook's handcuffs. (Mot. at PageID #1627, ECF No. 43) (citing Cook Deposition at PageID #1391–92, ECF No. 42-1). Approximately five minutes after Cook first complained to officers regarding the handcuffs, Cook complained to officers that he had a broken thumb that he was starting to lose feeling in. (Cook Deposition at PageID #1339–41, ECF No. 42-1); (*see also* Officer Romanin's Body Camera Footage, Ex. A to ECF No. 45). Within seconds, officers removed Cook from the handcuffs entirely. (*Id.* at PageID #1391–92).

While Cook was handcuffed with Officers Romanin and Blatnick, Officers Boss and Vasas began investigating ownership of the vehicle. (Mot. at PageID #1627, ECF No. 43). They approached Plaintiff's house, which was located on the same street as where the stop took place. (*See* Officer Boss's Body Camera Footage, Ex. C to ECF No. 45). When officers rang the doorbell, Cook's wife, Tonya McDade ("McDade"), opened the front door. (*Id.*) Officers then asked McDade whether she had anything proving that Boss was the rightful owner of the truck, to which McDade responded, "I'm trying to find that now." (*Id.* at 9:15-9:30). McDade then left the front door area and

-3-

Officer Boss proceeded to wait outside the house on the doorstep. (*Id.* at 9:30-10:00). Officer Boss then stepped into Plaintiff's entryway to ask McDade, who was no longer in the officer's sight, the name of Plaintiff's company. (*Id.* at 10:00-10:05). Boss and McDade then proceeded to have a brief conversation about Plaintiff's company with Officer Boss shouting from the doorway and McDade responding from upstairs. (*Id.* at 10:05-10:30). Boss asked McDade if she could find "something" that had the name and address of Plaintiff's company to help clear up the situation. (*Id.*) As McDade continued her search efforts upstairs, Officer Boss remained standing in Plaintiff's doorway. (*Id.* at 10:30-11:00). Boss then asked via radio for the name of the company the truck was registered under, to which someone on the radio responded, "Jaden Construction." (*Id.* at 11:00-11:20). Boss then stepped back outside, where he noticed that the other vehicles in the driveway had personalized plates with the same name as Cook's construction company. (*Id.* at 11:20-11:40); (*see also* Mot. at PageID #1628, ECF No. 43). At this point, Boss re-entered Plaintiff's home and shouted upstairs to McDade, "Do you mind if I come upstairs?" (Officer Romanin's Body Camera Footage, Ex. A to ECF No. 45 at 11:40-11:53); (*see also* McDade Deposition at PageID #1178–79, ECF No. 41-1). McDade responded, "Yes, I don't care." (McDade Deposition at PageID #1179, ECF No. 41-1). As Officers Boss and Vasas went upstairs, Boss said to McDade, "We're letting him go right now." (Officer Romanin's Body Camera Footage, Ex. A to ECF No. 45 at 11:53-12:00). McDade then showed Boss some blank checks for Cook's company. Officer Boss then apologized to McDade for the incident, explaining that when he ran Cook's license plate, their system indicated that it was listed as stolen. (*Id.* at 12:00-12:30). Officers Boss and Vasas then exited Plaintiff's home.

Once outside, Officer Boss then saw Cook backing his vehicle into the driveway. Officer Boss approached Cook's vehicle, apologized for the situation, and advised Cook to call the Cleveland Police Department to get the situation resolved. (Mot. at PageID #1628, ECF No. 43)

(citing Officer Boss's Body Camera Footage, Ex. C to ECF No. 45). Later that day, the Lyndhurst Police Department contacted the Cleveland Police Department to inform it that Cook's vehicle had been recovered. (Mot. at PageID #1625, ECF No. 43). Cook's truck was then removed from the stolen vehicle database. (*Id.*) (citing Ex. A to Messer Decl. at PageID #490, ECF No. 39-1).

**B.     Procedural History**

On July 30, 2022, Cook filed a Complaint (ECF No. 1-1) in the Cuyahoga County Court of Common Pleas against the Lyndhurst Defendants, the City of Cleveland, and five unidentified "John Doe" Defendants for alleged violations of his constitutional rights and alleged injuries sustained as a result of Defendants' conduct. On August 17, 2022, Cook filed an Amended Complaint (ECF No. 1-2), bringing allegations under 42 U.S.C. § 1983, as well as claims of assault/battery, false arrest/imprisonment, intentional infliction of emotional distress ("IIED"), negligence, and employer liability. (*See* Amended Compl. at PageID #23–32, ECF No. 1-2). The case was removed to this court pursuant to 28 U.S.C. § 1441 et seq. (ECF No. 1) on August 31, 2022. On October 5, 2022, Defendants filed their Answers (ECF No. 10–14). On August 15, 2023, Defendants filed the instant Motion for Summary Judgment. (ECF No. 43).

## II. LEGAL STANDARD

**A.     Summary Judgment**

Federal Rule of Civil Procedure 56(a) governs summary judgment motions and provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

A party asserting there is no genuine dispute as to any material fact or that a fact is genuinely disputed must support the assertion by:

-5-

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this court must view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determining whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most cases, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252. However, "[c]redibility judgments and weighing of the evidence are prohibited during the consideration of a motion for summary judgment." *Ahlers v. Scheibil*, 188 F.3d 365, 369 (6th Cir. 1999).

The moving party has the burden of production to make a prima facie showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). If the burden of persuasion at trial would be on the non-moving party, the moving party can meet its burden of production by either: (1) submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id*. If the moving party meets its burden of production, then the non-moving party must point out specific facts in the record which create a genuine issue of material fact. *Zinn v. United States*, 885 F. Supp. 2d 866, 871

(N.D. Ohio 2012) (citing *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992)). The non-movant must show "more than a scintilla of evidence to overcome summary judgment;" it is not enough to show that there is slight doubt as to material facts. *Zinn*, 885 F. Supp. 2d at 871 (quoting *Fulson*, 801 F. Supp. at 4). The trial court does not have "a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) (citation omitted)).

**B.     Qualified Immunity**

The doctrine of qualified immunity shields public officials from liability as long as their conduct "did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). The Supreme Court has stressed that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Id.* (citing *Mitchell v. Forsyth*, 472 U.S. 511, 535 (1985)). Rather, it means that, "in light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640; *see also, e.g.*, *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986); *Mitchell*, 472 U.S. at 528; *Davis v. Scherer*, 468 U.S. 183, 196–97 (1984).

A defendant bears the initial burden to put forth facts that suggest that he was acting within the scope of his discretionary authority. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). But the plaintiff bears the ultimate burden of proof to show that the defendant is not entitled to qualified immunity. *Wegener v. Covington*, 933 F.2d 390, 392 (6th Cir.1991); *see also Spurlock v. Satterfield*, 167 F.3d 995, 1005 (6th Cir. 1999) ("[T]he burden is on the plaintiff to allege and prove that the defendant violated a clearly established constitutional right.").

When assessing qualified immunity, "the court, viewing the facts in the light most favorable to the plaintiff, determines whether: (1) the violation of a constitutional right has occurred; and (2) the constitutional right at issue 'was clearly established at the time of defendant's alleged misconduct.'" *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Supreme Court used to require courts to address the first prong—*i.e.,* determine whether there was a violation of a constitutional right—before addressing whether the right was clearly established. *See Saucier*, 533 U.S. at 201. But that approach no longer is mandatory; courts now have discretion to choose which prong of the immunity analysis to address first. *See Pearson v. Callahan*, 555 U.S. 223, 236, 241 (2009).

### III. LAW AND ANALYSIS

Defendants argue that the individual Lyndhurst officers are shielded from liability under the doctrine of qualified immunity with respect to Plaintiff's federal claims because a reasonable officer in Defendants' position would not expect their actions to violate clearly established law under the Constitution. (Mot. at PageID #1629, ECF No. 43). Defendants also argue that Plaintiff cannot establish a *Monell* claim against the City of Lyndhurst because Plaintiff cannot point to an official policy or custom from the City of Lyndhurst that led to a violation of his constitutional rights. (*Id.* at PageID #1640–42). Defendants also raise several arguments and defenses with respect to Plaintiff's state law claims, including statute of limitations defenses and statutory immunity under Ohio law. (*Id.* at PageID #1642–46).

**A.    Section 1983 claims**

   *1.    Wrongful Arrest claim*

The Supreme Court has long held that warrantless searches and seizures are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-

delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). In *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968), the Supreme Court recognized one such exception: where officers have reasonable suspicion to believe that someone is connected with criminal activity, law enforcement have a lawful basis to stop and briefly question them for investigative purposes. *See id.* at 10–11; *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989). Accordingly, under *Terry*, police officers are permitted to conduct brief investigative stops, such as a traffic stop, "when a law enforcement officer has a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, 572 U.S. 393, 396–97 (2014) (citations omitted). To establish a wrongful arrest claim under the Fourth Amendment, a plaintiff must prove that the arresting officer lacked probable cause to arrest the plaintiff. *Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir. 2020) (quoting *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)). Under most circumstances, the police "cross the line" from an investigatory detention to a custodial arrest when someone is removed from a place they are entitled to be and are transported to the police station. *United States v. Smith*, 549 F.3d 355, 360 (6th Cir. 2008) (quoting *United States v. Butler*, 223 F.3d 368, 374 (6th Cir. 2000)).

Defendants argue that, although Plaintiff contends that he was arrested, Officer Boss had reasonable suspicion to conduct an investigatory stop under *Terry* after Detective Boss discovered that the vehicle Boss was driving was registered as stolen. (Mot. at PageID #1635, ECF No. 43). They also argue that Plaintiff was released from detainment as soon as Officer Boss determined that Cook's wife would be able to provide proof of Plaintiff's relationship to Jaden Construction. (*Id.* at PageID #1636). Accordingly, Defendants maintain that probable cause was not needed for officers to perform an investigative stop to establish Plaintiff's relationship with Jaden Construction. In response, Plaintiff argues that the officers lacked reasonable suspicion to stop him, as well as

-9-

probable cause to arrest him, because no criminal activity or traffic violation was observed or in progress when officers stopped him. (Pl's Opp. at PageID #1713, ECF No. 49-1). Plaintiff alleges that "the evidence shows that the license plates on the vehicle were properly registered and valid." (Pl.'s Opp. at PageID #1702, ECF No. 49-1). Plaintiff explains that because the plates on his truck were missing when he recovered his vehicle after it had been stolen, he obtained new plates from the Ohio Bureau of Motor Vehicles. (*Id.*) Accordingly, Cook argues, because his truck has different plates the night he was detained and because Boss could not see his VIN number when he stopped Plaintiff on the night in question, officers could not have determined that his vehicle was still listed as stolen. (*Id.*)

On reply, Defendants argue that because license plates are registered to a specific vehicle, when a driver registers their car for a new license plate they must supply the old license plate number *and* the vehicle VIN number. (Def.'s Reply at Page ID #1792, ECF No. 53) (citing Ex. A, Ohio BMV Replacement Plates Application Form). Defendants also submit an audio recording supported by a declaration from the City of Lyndhurst dispatcher who responded to Officer Boss's radio call regarding the allegedly stolen vehicle. (Fishburn Decl., ECF No. 53-2); (Ex. G to ECF No. 55). The dispatcher attests that on the day Officer Boss stopped Cook, she contacted the Cleveland Police Department and the Department confirmed that Cook's truck was listed as stolen. (*See* Fishburn Decl. at PageID #1808, ECF No. 53-2); (*see also* Ex. G, ECF No. 55*).

Upon review of the record, the court finds that Officer Boss had a particularized and objective basis to believe that the car Plaintiff was driving was stolen. Although Cook contends that the license plate changes negate the possibility of his car still being registered as stolen at the time of the incident, the audio recording between Lyndhurst dispatcher and the Cleveland Police Department establish that the car was still registered as stolen in the Cleveland Police Department's

-10-

system on the night in question. (*See* Ex. G at 2:43-7:15, ECF No. 55). Accordingly, a reasonable officer in Boss's position would have a reasonable suspicion to believe that Cook was driving a stolen vehicle. Moreover, Plaintiff was stopped for less than fifteen minutes while officers investigated his relationship to the company his car was registered under. (*See* Boss Bodycamera Footage, Ex. C to ECF No. 45); (*see also* Romanin Bodycamera Footage, Ex. A to ECF No. 45). Accordingly, the court finds that officers are entitled to qualified immunity on Plaintiff's wrongful arrest claim because Plaintiff has not established that he was arrested. *See Smith*, 549 F.3d at 360 ("In this case, handcuffing Smith and transporting him to a police post, where he remained handcuffed for at least an hour and a half, rises to the level of arrest.")

    2.    *Excessive Force claim*

The Fourth Amendment guarantees a person's right to be free from the use of excessive force when they are stopped, arrested, or held in custody. *Hughey v. Easlick*, 3 F.4th 283, 288 (6th Cir. 2021) (citations omitted). Defendants argue that the Lyndhurst officers are entitled to qualified immunity with respect to two claims of excessive force: (1) holding Cook at gun point when performing a traffic stop for an allegedly stolen vehicle and (2) handcuffing him as they investigated whether the car he was driving was in fact stolen. (Mot. at PageID #1632–33, ECF No. 43). Defendants also contend that the other officers had no duty to intervene to prevent any alleged violations of Cook's constitutional rights because Boss was the only officer to stop Plaintiff and Officer Romanin was the only one to hear Cook complain about the tightness of his handcuffs. (*Id*. at PageID #1639–40). When a case involves multiple allegations of excessive force, "the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way." *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020) (quoting *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017) (per curiam)). Moreover, "[w]hen

-11-

more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately." *Id.* However, an officer can be held liable for another officer's use of excessive force if the onlooking officer "observed or had reason to know that excessive force would be or was being used," but failed to intervene to stop another officer's use of excessive force. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). The court will address each of Defendants' arguments in turn.

      a)      Felony Stop at Gunpoint

The Sixth Circuit has explained that "[a]n excessive-force claim turns on whether an officer's actions were 'objectively reasonable' given the circumstances he confronted." *Shanaberg v. Licking Cty.*, 936 F.3d 453, 455–56 (6th Cir. 2019) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). In making this determination, a court must consider "whether the 'totality of the circumstances' justified the degree of force an officer used." *Shanaberg*, 936 F.3d at 456 (quoting *Bletz v. Gribble*, 641 F.3d 743, 751 (6th Cir. 2011)). This analysis turns on three factors: "the severity of the crime at issue; whether the suspect posed an immediate threat to the officers or others; and whether the suspect actively resisted arrest or attempted to evade it." *Shanaberg*, 936 F.3d at 456 (citing *Graham*, 490 U.S. at 396).

Defendants claim that because Officer Boss had reasonable suspicion to believe that Cook was driving a stolen vehicle, it was reasonable for Boss to order Cook out of his vehicle at gunpoint. (Mot. at PageID #1632–33, ECF No. 43). They also demonstrate that the officers holstered their guns once Cook was in handcuffs and any potential threat was abated. (*Id.*) (citing Ex. A thru D to ECF No. 45). Accordingly, Defendants argue that the temporary use of firearms was reasonable under the circumstances. In response, Plaintiff argues that the officers are not entitled to qualified immunity because they lacked probable cause to arrest him. (Pl's Opp. to Mot. at PageID #1715, ECF No. 49-

-12-

1). However, he does not address whether officers had a reasonable suspicion to stop him for an allegedly stolen vehicle, nor does he address whether the officers' use of their firearms to detain him was unreasonable in his case.

In the absence of such, the court finds that Plaintiff has failed to carry his burden in establishing that the officers violated his constitutional rights with respect to their use of guns to conduct their felony vehicle stop. *See Spurlock*, 167 F.3d at 1005. ("[T]he burden is on the plaintiff to allege and prove that the defendant violated a clearly established constitutional right."). Furthermore, even if Plaintiff could establish that Officer Boss's felony stop at gunpoint violated his Fourth Amendment rights, he fails to cite any binding precedent clearly establishing such a right. Indeed, in a situation similar to this one, the Sixth Circuit has held qualified immunity to be proper. *Dorsey v. Barber*, 517 F.3d 389, 401–03 (6th Cir. 2008). For these reasons, the officers are entitled to qualified immunity on the excessive force claim as it relates to the felony stop at gunpoint.

b) Handcuffing

As with any excessive-force claim under the Fourth Amendment, when faced with an excessive-force claim regarding an officers' handcuffing, courts must engage in a fact–specific inquiry to determine whether the officer's actions were objectively reasonable. *Hughey*, 3 F.4th at 289. In addition to the three-part test stated above for determining whether an officer's use of force was reasonable, the Sixth Circuit has also established a three-part test for determining whether "unduly tight or excessively forceful handcuffing constitutes excessive force." *Id.* (citing *Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009)).[1] To survive summary judgment on

---

[1] In *Graham v. Connor*, the Supreme Court outlined a fact-specific test for determining whether an officer's use of force was reasonable under the circumstances. There, the Court stated that courts should consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to

such a claim, a plaintiff must create a genuine dispute of material fact that "(1) [they] complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Hughey*, 3 F.4th at 289 (citations omitted). If the plaintiff establishes the above, then summary judgment is unwarranted. *Id.* The first and third prongs of the Sixth Circuit's excessive force test with respect to handcuffing are undisputed in this case. The parties agree that Plaintiff complained that the handcuffs were causing him pain, and Defendants do not dispute Plaintiff's contention that the handcuffs caused him injury. (*See* Pl.'s Opp. to Mot. at PageID #1717–18, ECF No. 49-1); (*see also* Def.'s Reply Mot. at PageID #1795–96, ECF No. 53). Instead, the parties disagree regarding whether the officers ignored Plaintiff's complaints.

Plaintiff contends that officers did not "sufficiently and timely address and resolve [his] complaints." (Pl.'s Opp. to Mot. at PageID #1718, ECF No. 49-1). Defendants contend that bodycamera evidence demonstrates that Officer Romanin adjusted Cook's handcuffs within 65 seconds the first time Plaintiff complained and within 41 seconds of Cook complaining the second time. (Def.'s Reply Mot. at PageID #1795–96, ECF No. 53); (*see also* Officer Romanin's Body Camera Footage, Ex. A to ECF No. 45). Accordingly, because the officers adjusted Plaintiff's handcuffs, Defendants argue that officers did not ignore Plaintiff's complaints. (Mot. at PageID #1633–35, ECF No. 43). The court finds that the officers in this case did not ignore Plaintiff's complaints. Officer Romanin responded to Plaintiff's complaints about the handcuffs by loosening his handcuffs following the first complaint and releasing him from the handcuffs entirely following the second complaint. While Plaintiff contends that officers did not respond to his complaints in a timely fashion, this is insufficient to overcome qualified immunity on an excessive force claim

---

evade arrest by flight." *Graham*, 490 U.S. at 396.

regarding handcuffing. *See Hughey*, 3 F.4th at 289. Because Plaintiff cannot demonstrate that officers ignored his complaints, the court concludes that Officer Romanin is entitled to qualified immunity on Plaintiff's handcuffing claim. Additionally, because the court finds that Plaintiff cannot establish an excessive force claim with respect to handcuffing, the court also concludes that Plaintiff cannot maintain a duty to intervene claim against the other Lyndhurst Defendants.

        3.        *Unlawful Entry claim*

Defendants contend that Officers Boss and Vasas are entitled to qualified immunity with respect to Plaintiff's unlawful entry claim. They argue that it would not be clear to a reasonable officer in Boss's position that stepping into the vestibule of someone's home when they leave the front door wide open, walk away, and continue their conversation with officers from inside the house constitutes a violation of that person's Fourth Amendment rights. (Mot. at PageID #1636–39, ECF No. 43). Defendants also argue that Cook's wife consenting to officers entering the home vitiates Cook's unlawful entry claim. (*Id.*) Plaintiff argues that any entry into his home without a warrant was presumptively unreasonable and a violation of his Fourth Amendment rights. (Pl.'s Opp. to Mot. at PageID #1718–19, ECF No. 49-1). Plaintiff also seemingly contests that his wife's voluntarily consented to officers entering the home. Rather, Plaintiff implies that any such consent was given under duress. (*Id.* at PageID #1719–20).

It has long been established that an officer may not enter a person's home without a warrant unless an exception to the Fourth Amendment's warrant requirement applies. *Barton v. Martin*, 949 F.3d 938, 950 (6th Cir. 2020) (collecting cases). However, the Fourth Amendment does not prohibit all "unwelcome intrusions" on private property—only unreasonable ones. *Williams v. Maurer*, 9 F.4th 416, 431 (6th Cir. 2021) (quoting *Caniglia v. Strom*, 593 U.S. 194, 198 (2021)). For instance, "a police officer not armed with a warrant may approach a home and knock" just as any private

citizen could do. *Florida v. Jardines*, 569 U.S. 1, 8 (2013) (citing *Kentucky v. King*, 563 U.S. 452, 469 (2011)). If the occupant "chooses to open the door and speak with officers," the occupant is under no obligation to answer the officers' questions, nor must they permit the officers to enter the premises. *King*, 563 U.S. at 469. In *Florida v. Jardines*, the Supreme Court recognized an "implied license" or "customary invitation" as a basis for determining whether the officer's potentially unwelcome intrusion on a person's private property is nevertheless reasonable. *See Jardines*, 569 U.S. at 8–9 (finding there is no "customary invitation" or implied license for officers to use a trained police dog to explore the area around a person's home in hopes of discovering incriminating evidence); *see also United States v. Mason*, 1996 WL 469155, at *2 (6th Cir. 1996) ("In this case, while the defendant did not give verbal permission to enter, implied consent to enter the apartment could be found from defendant's conduct in opening the door after the officers' announcement, stepping back and eventually sitting on the bed."). However, "[t]he scope of the license—express or implied—is limited not only to a particular area but also to a specific purpose." *Jardines*, 569 U.S. at 9.

Here, the court finds that Officer Boss's entry into the vestibule of Plaintiff's home for the limited purpose of continuing to speak with McDade was not unreasonable. Bodycamera evidence from the night in question shows that Officers Boss and Vasas were outside Plaintiff's home when McDade answered the door. (Ex. C at 8:30–9:15, ECF No. 45). Officer Boss then asked McDade whether she had anything to prove that Plaintiff was the rightful owner of the truck, which prompted McDade to leave the front door in search of something to give the officers. (*Id.* at 9:15–9:35). Officer Boss remained outside until he had a follow-up question for McDade, who was no longer standing in the doorway. (*Id.* at 9:35–10:00). He shouted toward the staircase located immediately to the left of the front door to ask McDade a couple questions and continued to have a brief conversation with

McDade who was now upstairs. (*Id.* at 10:00–10:30). Officer Boss then waited in the vestibule until he received a radio confirmation that the business the car was registered to matched the name of the business on Plaintiff's other vehicles. (*Id.* at 10:30–11:25). In light of the above, the court finds that Officer Boss's actions were not unreasonable. McDade extended an implied license for Officer Boss to enter the vestibule of Plaintiff's home for the limited purpose of speaking with McDade from upstairs by leaving the door wide open, retreating upstairs out of the officer's view, and continuing her conversation with Officer Boss from upstairs.

With respect to Plaintiff's argument that Defendants failed to demonstrate that McDade voluntarily consented to officers entering their home, the court concludes otherwise. Plaintiff points to no evidence to substantiate his argument that McDade was under duress when she later permitted Officer Boss to enter the house and come upstairs to inform her that they had released her husband. (*See* Pl.'s Opp. to Mot. at PageID #1719–20, ECF No. 49-1). For its part, Defendants highlight that when McDade opened the door, she identified herself as Cook's wife. (Mot. at PageID #1636, ECF No. 43). Based on her age and identification as Cook's wife, a reasonable officer in Boss's position would believe that McDade had lawful authority to consent to officers entering Cook's home. (*Id.*) Moreover, officers argue that bodycamera footage from McDade's exchange with Boss indicates that, under a totality of the circumstances, McDade impliedly and explicitly consented to officers entering her home for the limited purpose of verifying Cook's ownership of the allegedly stolen vehicle. (Def.'s Reply at PageID #1798, ECF No. 53). As Defendants argue, the exchange between McDade and Boss was brief, for the limited purpose of answering Boss's questions about the allegedly stolen vehicle, and the officers did not engage in any "coercive or punishing conduct" to obtain entry into the home. (*Id.* at PageID #1797–98) (citing *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999). Accordingly, the court concludes that Officer Boss and Vasas are entitled to

qualified immunity on Plaintiff's unlawful entry claim because Plaintiff cannot establish that the officers' actions were a violation of clearly established law.

    4.    *Monell claim*

Section 1983 provides a remedy for any person who is deprived of their constitutional rights by another person acting under the color of state law. *See* 42 U.S.C. § 1983; *see also Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). In order to establish a Section 1983 claim against a municipality, a plaintiff must show that an official policy or custom of the municipality caused an injury that amounted to a deprivation of plaintiff's constitutional rights. *See*, *e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. Dept. of Soc. Serv. of City of New York*, 436 U.S. 658, 691 (1978)). Alternatively, a plaintiff can also show that an official with final decision-making authority ratified illegal actions that caused the plaintiff's injury or that the municipality had a policy of inadequate training or supervision that resulted in a constitutional violation. *See Wiley v. City of Columbus*, 36 F.4th 661, 670 (6th Cir. 2022) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). Notably, if there is no constitutional violation established, then a *Monell* claim would necessarily fail. *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citing *Scott v. Clay Cnty., Tenn.,* 205 F.3d 867, 879 (6th Cir. 2000)). Having found no underlying constitutional violation above, the court concludes that Defendants are entitled to summary judgment on Plaintiff's *Monell* claim.

    5.    *Official Capacity claim*

Defendants read Plaintiff's Amended Complaint as suing the Defendant officers in their individual and official capacities. (*See* Mot. at PageID #1647, ECF No. 43). Defendants contend that the claims against Officers Boss, Vasas, Romanin, and Blatnick must be dismissed because they are "duplicative" and "tantamount" to the claims against the City of Lyndhurst. Cook disagrees, arguing

that "the various claims by the Plaintiff are not duplicative as each named Defendant is specifically alleged to have violated his constitutional and other rights as well as commit various tortious acts." (Pl.'s Opp. to Mot. at PageID #1733, ECF No. 49-1). Courts have long acknowledged that "[a] suit against an individual in his official capacity is the equivalent of a suit against the governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6thCir. 1994) (citing *Will v. Michigan Dept. Of State Police*, 491 U.S. 58, 68 (1989)); *see also Everson v. Leis*, 556 F.3d 484, 493, n. 3 (6th Cir. 2009) (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). In other words, an official capacity claim is merely another way of "pleading an action against an entity of which an officer is an agent." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Monell*, 436 U.S. at 690, n. 55).

To the extent that Cook is suing the Defendant Officers in their official capacities, which is not apparent from his Amendedt Complaint, Cook's claims are redundant because he is also suing these officers in their individual capacities as named defendants. Accordingly, the court dismisses Plaintiff's official capacity claims against the officers. *See Irvin v. City of Shaker Heights*, 809 F.Supp.2d 719, 739 (N.D. Ohio 2011) (dismissing Plaintiff's "official capacity" claims against named Defendants because the claims were "in truth claims against [the city] itself").

**B.      State law claims**

Federal courts may exercise supplemental jurisdiction over state law claims that are so related to claims for which the court has original jurisdiction, such that the state claims form part of the same case or controversy under the court's original jurisdiction. *See* 28 U.S.C. § 1367(a). However under 28 U.S.C. § 1367(c), "district courts may decline to exercise supplemental jurisdiction over a claim [...] if the district court has dismissed all claims over which it has original jurisdiction." The Supreme Court has long held that where federal law claims are dismissed before trial, district courts should generally decline to exercise supplemental jurisdiction over the related state law claims.

*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Poindexter v. McKee*, 444 F.Supp.2d 783, 786 (W.D. Mich. 2006) (collecting cases). Having dismissed Plaintiff's federal claims, the court declines to exercise supplemental jurisdiction over Cook's remaining state law claims. *See Poindexter*, 444 F.Supp.2d at 786; *see also Vos v. Cordray*, 719 F.Supp.2d 832, 842–43 (N.D. Ohio 2010).

### IV. CONCLUSION

For the foregoing reasons, the court grants Defendant's Motion for Summary Judgment (ECF No. 43) with respect to Plaintiff's federal claims and declines to exercise supplemental jurisdiction over the remaining state law claims.

IT IS SO ORDERED.

*/s/ SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

March 30, 2024